# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIM. NUMBER: 11-222-01** |
| **HUGH CLARK** | : | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

For over four years, Ivy League educated lawyer Hugh Clark stole funds intended for the public schoolchildren of Philadelphia. No amount of money was too large or too small for defendant Clark to steal: in May, and again in October, 2005, defendant Clark directed his co-conspirator Ina Walker to draft and sign bogus $25,000 "loan" checks to their private school, Lotus Academy; from May 2007 to August 2009, Clark diverted $500 per month to pay bills for Clark's failed dialup internet company, Tekhen. In a city where the public school district struggles under persistent financial woes to educate our children, the misappropriation of $522,000 from a charter school is no small matter.

Moreover, in a separate but overlapping scheme, Clark and Walker resorted to bank fraud to house their failed business venture, the Black Olive restaurant, and defaulted for over $339,000 of the loan. The sentence for these criminal frauds must be commensurate with the gravity of the offense, and should act as a deterrent to other potential violators. For these reasons, as well as for the reasons provided below, the government recommends a sentence of incarceration within the advisory guideline range of 33 to 41 months.

I.       BACKGROUND

Defendant Clark's criminal conduct is summarized in the government's plea memo and the presentence report.  In essence, defendant Clark pleaded guilty to the 28 count superseding indictment charging conspiracy, wire fraud, theft from a federally funded program, and bank fraud based on his role in defrauding the Philadelphia based New Media Technology Charter School ("New Media") and the Wilmington Savings Fund Society.[1]

Hugh Clark, the former Chair of the Board of New Media Technology Charter School, defrauded New Media by misappropriating $522,000 in funds intended for the schoolchildren of New Media.  This includes $309,000 in fraudulent payments diverted from New Media directly to Lotus Academy; and an additional $213,000 in fraudulent payments by causing New Media to spend money on at least 15 third parties, for the benefit of Lotus Academy, Black Olive Health food store, Black Olive restaurant, Tekhen enterprises, and Clark and Walker's personal credit card expenses.  Over the course of four years, Clark was organizer of the criminal venture and routinely directed Ina Walker to draft and sign dozens and dozens of checks–large and small– to further their pet projects and personal interests.  This included:

•       **<u>Favorable lease agreements and fraudulent lease payments</u>**:  Between August 2004 and June 2009, defendants Clark and Walker directed at least $1 million in net payments to Lotus Academy or for the benefit of Lotus Academy.   Not only did these agreements provide for a generous and steady stream of income from New Media to Lotus

---

[1]  As a condition of the plea agreement, the defendant agreed to "pay the special victims/witness assessment in the amount of $2,800 before the time of sentencing."  As of this filing, the assessment has not yet been paid.

Academy–where Clark and Walker could then spend the money without any oversight[2]-- the steady rental payments from New Media to Lotus Academy disguised the additional, fraudulent payments that defendants Clark and Walker directed from New Media to Lotus Academy.

- **Fraudulent payments sent directly to Lotus Academy**:  From in or about May 2005 to in or about June 2009, defendants Clark and Walker diverted from New Media at least $309,000 in fraudulent payments directly to Lotus Academy.   The fraudulent payments–primarily checks drafted and signed by Walker at Clark's direction-- ranged from $6,000 to $25,000.  Defendant Clark directed that the payments be falsely designated in New Media accounting records as loans to Lotus Academy or repairs to the middle school building.  Once the money was deposited into Lotus Academy bank accounts, defendants Clark and Walker spent the money on the expenses of their private school, and also on their personal and business ventures.

- **Payments to Vendors and Contractors for the benefit of Lotus Academy, Black Olive, and Tekhen:**  Defendant Hugh Clark and his co-conspirator Walker caused New Media to pay operating expenses for Lotus Academy and the Black Olive business ventures, often disguising these benefits by adding additional expenses to existing New

---

[2]   During the charged years, over 25% of Lotus Academy's bank deposits consisted of New Media checks.  Clark and Walker then directed payments from Lotus to a broad range of related-party payees, including: The Black Olive, Clark & McGill PC, Hugh Clark, Tekhen Communications, and North By Northwest Restaurant.  A significant amount of Lotus Academy checks were traced into accounts controlled by Clark and Walker.  That is, Clark and Walker made a significant number of Lotus Academy checks payable to Lotus employees and contractors.  Those individuals were directed by Clark to cash the checks and deposit money into accounts controlled by Clark and/or Walker.

Media expenses.

1)  Clark and Walker used New Media funds to hire and pay a contractor for the purpose of creating and preparing the Black Olive health food store for opening.  Although the contractor had an office at the New Media middle school, the contractor did not teach students or have any legitimate function in the New Media middle school.

2)  Clark hired a marketing contractor to provide marketing services to New Media, Lotus Academy, the Black Olive business ventures, and another restaurant in which Clark and Walker had an ownership interest, and paid the marketing contractor with New Media's funds.

3)  Clark, without notice to or approval from the New Media board of directors, entered New Media into a written contact to purchase a school property for the sole purpose of benefitting Lotus Academy.  Defendants Clark and Walker used $15,000 of New Media's funds as part of the $45,000 deposit for purchase of the school property.  When the sale did not close and the $45,000 deposit was returned to Lotus Academy, defendants Clark and Walker never returned the $15,000 to New Media; rather, Clark and Walker caused the entire $45,000 to be spent in various ways, including for Lotus Academy expenses (rent and payroll), payments to the Black Olive business ventures, and a cash deposit into defendant Walker's personal bank account to pay Walker's personal bills.

4)  Clark and Walker spent New Media funds on additional "joint" expenses with Lotus Academy, such as two annual awards banquets at a Philadelphia hotel, and two overnight staff retreats to Ocean City, Maryland.  New Media covered all of these costs without reimbursement by Lotus Academy.

5) Clark and Walker caused New Media to pay utility expenses for Lotus Academy and the Black Olive business ventures including a July, 2009 payment of $3,617.29 to PECO pay the overdue PECO bill for Black Olive health food store.

6) Clark spent New Media funds to pay two different vendors for Clark's personal business, Tekhen Communications. Defendant Clark caused New Media to pay a Tekhen vendor, Hivelocity Ventures, not just for web domains and services that Hivelocity provided to New Media, but also for web domains and services for Lotus Academy, Black Olive, Tekhen, and Hugh Clark's law firm, Clark and McGill. Defendant Clark caused New Media to pay a different Tekhen vendor, Dialup U.S.A., which provided no services to New Media. New Media was never reimbursed for these costs.

As a result of the improper and fraudulent payments directed by defendants Hugh Clark and Ina Walker, New Media failed to pay legitimate New Media expenses. For example, from in or about December 2007 through in or about February 2009, New Media failed to remit the required monthly employee withholdings and quarterly employer contributions to the Pennsylvania Public School Employees Retirement System. From October 2006 through November 2008, New Media carried a past-due balance with one of its primary textbook vendors. On several occasions, there were insufficient funds in New Media's bank account to cover employee payroll checks. In Spring of 2009, coaches for New Media's athletic teams remained unpaid or partially paid.

The government expects that up to four of Clark and Walker's victims will be present at sentencing and with the Court's permission, will testify about the financial and emotional injuries caused by these crimes – from lack of textbooks, to bounced paychecks, to

missing retirement (PSERS) payments.  In addition, because some former New Media staffer's own words convey the injuries more effectively than any summary by the government, attached to this memorandum are the resignation letters of former bookkeeper T.M. (Exhibit 1) and former operations manager S.G. (Exhibit 2).

In addition to funding his failed internet business (Tekhen), his failed restaurant (Black Olive Restaurant) and failed health food store (Black Olive Health food store) with money intended for public schoolchildren, Clark's additional criminal conduct includes bank fraud. That is, the Wilmington Savings Fund Society ("WSFS") relied on income from three fake leases submitted by defendants Walker and Clark when valuing the property they chose to house the Black Olive restaurant.   Defendant Clark also submitted a false 2005 tax return for defendant Walker, whom he directed to act as straw purchaser.  Co-defendant Ina Walker failed to make the required loan repayments to WSFS and defaulted on the loan for an amount of approximately $339,000, leaving the bank holding the bag and pursuing foreclosure.

II.     SENTENCING CALCULATION.

A.      Statutory Maximum Sentence.

The maximum sentence that may be imposed on the defendant is 545 years' imprisonment, a five year period of supervised release, $7,750,000 fine, and a $2,800 special assessment.  Full restitution of as much as $861,000 also shall be ordered.

B.      Sentencing Guidelines Calculation.

As stated in the presentence report (PSR), the correct guideline calculation is as follows.  Defendant's base offense level is 7.  PSR ¶ 35.  Fourteen levels are added because the loss exceeded $400,000.  PSR ¶ 36.  Two levels are added because defendant abused a position

of trust as President of Board of Directors of New Media that contributed to the offense.  See PSR ¶ 39; U.S.S.G. §3B1.3.  After a three level adjustment for acceptance of responsibility, Clark's total offense level is 20.  See PSR ¶ 45.  Defendant has zero criminal history points, resulting in a criminal history category I.  PSR ¶ 48.  With an offense level of 20 and a criminal history category of I, the defendant's sentencing range is 33 to 41 months imprisonment.  PSR ¶ 71.

Defendant Clark has identified two proposed bases for departure from the guidelines.  As discussed below, the facts do not justify a departure.

### A.  DEFENDANT'S CHARITABLE WORK DOES NOT JUSTIFY A DEPARTURE.

The defendant states in his sentencing memorandum that "exceptional public service and charitable acts warrant a downward departure.  See Defendant's Memorandum, at p. 4.  The Court should deny this invitation to depart downward.

The sentencing guidelines explicitly discourage downward departures for good works.  U.S.S.G. § 5H1.11; United States v. Cooper, 394 F.3d 172, 176 (3d Cir. 2005), citing, United States v. Thurston, 358 F.3d 51, 78 (1st Cir. 2004).   Only when those works are "exceptional" do the guidelines indicate that they should serve as a basis for a departure.  Id. Whether good works qualify as "exceptional" is specifically evaluated by assessing the defendant's status in life.  Id.  Specifically,  more is expected[3] of defendants with higher status or

---

[3]  More is expected of "high-level business executives" who enjoy "sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities."  United States v. Haversat, 22 F.3d 790, 796 (8th Cir. 1994).  Indeed, "it is usual and ordinary, in the prosecution of similar white-collar crimes involving high ranking corporate executives . . . to find that a defendant was involved as a leader in community charities, civic

income or business positions, who enjoy the community status which provides them with greater opportunities to engage in charitable and benevolent activities.

Indeed, business leaders "are often expected, by virtue of their positions to engage in civic and charitable activities."  Thurston, 358 F.3d at 81.  If a defendant's position or status which gave him the resources to undertake the claimed charitable works, also enabled him to commit his crimes, then his sentencing claim that his "good works" are exceptional and entitle him to reduced punishment is undermined significantly.  Id. at 79.  Likewise, the Third Circuit has indicated that claimed charitable activities which in fact are merely work- or career-related constitute a weak showing of "exceptional" works.  See United States v. Serafini, 233 F.3d 758, 773 (3d Cir. 2000) (upholding decision to depart downwards); see also United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (reversing downward departure granted to defendant, a business person, on the basis of civic contributions); United States v. Morken, 133 F.3d 628, 630 (8th Cir. 1998) (reversing downward departure when defendant, a business person, advised local business owners, hired young people, served on a church council, and raised money for charity).

In United States v. Scheiner, 873 F.Supp. 927 (E.D.Pa. 1995), the district court, in the context of denying bail pending appeal, explained its prior decision not to depart downwards on the basis of charitable works, performed by a doctor who had pleaded guilty to Medicare fraud.  Even though "the defendant presented extensive testimony . . .  about his good works among the young and poor in the North Philadelphia area, . . .  as far back as the 1970s,"

---

organizations, and church efforts."  United States v. Kohlbach, 38 F.3d 832, 838 (6th Cir. 1994). Courts are mindful that individuals "who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot."  Thurston, 358 F.3d at 80.

id. at 934, the district court rejected the departure request for several reasons, including the fact that the defendant, albeit indirectly, had received financial benefit and business goodwill in the community from his activities, id. at 934 n. 7, and because a reduction in the doctor's sentence might have suggested to observers that the law distinguishes between defendants of different racial and socioeconomic backgrounds, and would have sent the wrong message to the medical community.  Id. at 934.  Although the claimed charitable activities were "commendable," they were insufficiently "extraordinary" to merit a downward departure under the circumstances of the case.  Id.; see also United States v. Jordan, 130 F.Supp.2d 665, (E.D.Pa. 2001) (denying departure request by defendant who had pleaded guilty to food-stamp fraud and money laundering; despite the fact that the defendant was "not a wealthy man," and despite the defendant's "financial contributions to several charitable organizations; his compassion and emotional and financial support for his severely disabled uncle and his late mother; his generosity in providing food, store credit, or a helping hand to community members in need; and his willingness to serve as a mentor and role model for youth in his neighborhood," his conduct was "commendable" but not so extraordinary so as to deserve a departure).

   Clark's memorandum explains that he cared for several family members in times of need.  These acts, while commendable, are spread over a several year period.  They do not depict remarkable conduct unlike that engaged in by many people under comparable circumstances.  Likewise, it is clear that defendant Clark founded Lotus Academy and served on the boards of other non-profit organizations.  However, the evidence shows that here, he used Lotus Academy to facilitate his frauds–by funneling money to, and disguising ownership of, related party entities like Black Olive Restaurant and health food store.  Moreover, Clark's

service on community boards, however commendable, also directly increased his visibility in the fields in which he worked. Thus, contrary to his claim in his memorandum, much of defendant's charitable activities were aimed towards advancing his career by attempting to engender, indirectly, business goodwill and future financial gain. See Thurston, 358 F.3d at 78; Serafini, 233 F.3d at 773; Crouse, 145 F.3d at 792 Morken, 133 F.3d at 630; Scheiner, 873 F. Supp. at 934. As Judge Posner of the Seventh Circuit has observed, "[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." See United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (rejecting departure argument based on white-collar defendant's claimed community services as "risible"). Clark's request for a downward departure on this basis should be rejected.

   **B.    DEFENDANT'S CONDUCT SPANNING MORE THAN FOUR-YEARS TIME DOES NOT WARRANT AN ABERRANT BEHAVIOR DEPARTURE .**

   Clark's motion for a downward departure based on aberrant behavior under § 5K2.20 already subsumes a defendant's lack of criminal history. Clark's essential argument--the older the first-time offender, the longer he went without committing a crime, so the more aberrant his criminal conduct must be--constitutes an improper attempt to circumvent what he knows is a baseless argument for an aberrant behavior downward departure. United States v. Maldonado-Acosta, 210 F.3d 1182, 1184 (10th Cir. 2000) (aberrant behavior departure should not be used as a "back door" through which otherwise inappropriate factors may enter into the sentencing determination; citations omitted).

Clark in no way qualifies for a departure based on aberrant behavior. Section

5K2.20 authorizes a sentencing court to depart downward

> Only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life.

Application Note 2 to Section 5K2.20 advises that extensive fraud schemes, such as Clark's,

would not qualify a defendant for the departure:

> Repetitious or significant, planned behavior does not meet the requirements of subsection (b). For example, a fraud scheme generally would not meet such requirements because such a scheme usually involves repetitive acts, rather than a single occurrence or single criminal transaction, and significant planning.

The Court of Appeals for the Third Circuit requires a sentencing court to address

two separate and independent questions: whether the defendant's case is extraordinary and

whether his conduct constituted aberrant behavior. The defendant must prove both in order for

the court to consider exercising its discretion to depart. United States v. Dickerson, 381 F. 3d

251, 264 (3d Cir. 2004); United States v. Castano-Vasquez, 266 F.3d 228, 235 (3d Cir. 2001).

Clark can prove neither. There is obviously nothing extraordinary about this case

or Clark's participation in the criminal conduct. Indeed, Clark used all of the tools of the

fraudster's trade: misappropriating checks and fabricating bills, leases, or other documents if

anyone asked questions. More importantly, his crimes were far from a one-shot, aberrant event.

Instead, Clark directed the federal funds fraud scheme for over four years, resulting in at least

$522,000 theft from the school, that involved almost two dozen bank accounts: 11 New Media

accounts (all have Ina Walker as signatory; some have a co-signer); 5 Lotus Academy accounts

(all have Ina Walker as signatory; some have co-signer); 6 Hugh Clark signatory accounts (1 Clark and McGill; 1 Hugh Clark "Attorney at Law"; 3 Black Olive accounts; 1 Hugh Clark/Tekhen enterprises); and 2 Ina Walker personal bank accounts. In addition, three American Express credit card accounts were reviewed. Clark directed a separate bank fraud scheme –creating three fake leases and a fake tax return-- resulting in $339,000 loss to the bank. And the implicit contention that Clark deserves a departure because of his age at the time of his offense is wholly meritless. See Castano-Vasquez, 266 F.3d at 230-231 (denying motion to defendant who was in his fifties, had no prior record, did volunteer work in his community, suffered from medical problems, and imported drugs only once to gain money to support his family after losing his ability to provide for them by farming); Dickerson, 381 F.3d at 265-267 (denying departure to defendant when several weeks between suggestion to defendant to be a drug courier and her doing so indicated that crime was not of "limited duration"); United States v. Marcello, 13 F.3d 752, 761 (3d Cir. 1994) (scheme in which defendant deposited $9,000 each day over one week period was not aberrant behavior); United States v. McClatchey, 316 F.3d 1122, 1133-1136 (10th Cir. 2003) (reversing departure for aberrant behavior where defendant's involvement in Medicare kickback scheme lasted at least many months); United States v. Atkins, 25 F.3d 1401, 1404-1405 (8th Cir. 1994) (scheme in which defendant prepared false income tax returns and directed others to do so not aberrant behavior).

Clark's reliance on United States v. Rowen, 2007 US Dist Lexis 2126, (E.D.Pa January 10, 2007) is misplaced. There, the Court granted a downward variance based upon its view that the defendant "lacked a good education" and did not "fully appreciate" the illegality of his misuse of a power of attorney. It contains no discussion of the Section 5K2.20 factors. And

it certainly does not compare to the conduct of defendant Clark, an Ivy League educated attorney who diverted $522,000 in funds intended for the public schoolchildren of Philadelphia. This Court should decline to exercise its discretion to depart on this basis.

Finally, the guidelines do not overstate the seriousness of defendant's crimes. <u>See</u> Defendant's Memo at p. 15. Defendant's base offense level is 7. PSR ¶ 35. Fourteen levels are added because the loss of $861,000 far exceeds $400,000 but is less than $1 million. PSR ¶ 36. [4] The school fraud alone ($522,000) reaches this threshold. Moreover, defendant's claim that he did not profit from the misuse of school funds (and, of course $339,000 in WSFS bank funds) is belied by the facts. For example, review of credit card statements shows that Hugh Clark routinely used his New Media credit card for personal expenses such as gas and groceries, resulting in a total fraud loss of $30,000. He paid a $500 monthly bill to a vendor (Dialup USA) of his failed internet business, Tekhen, by direct transfer from New Media's accounts; thus Clark profited by causing New Media to make a total of $14,500 in fraudulent payments to the vendor of Clark's solely owned company, such that Clark would not have to pay those expenses himself. Likewise, Clark caused New Media to make $14,376 in payments to another Tekhen vendor named Hivelocity Ventures. While New Media received some services (specifically, the use of email and the domain "newmediatech.net"), during this time period, the payments were far in excess of New Media's actual cost. Thus New Media's fraud loss associated with Hivelocity is

_____

[4] Two levels are added because defendant abused a position of trust as President of Board of Directors of New Media that contributed to the offense. <u>See</u> PSR ¶ 39; U.S.S.G. §3B1.3. Thus, the government did not advocate a two-level enhancement, under Section 2B1.1(b)(8)(A), because the defendant misrepresented that he was acting on behalf of a charitable organization.

conservatively estimated at 50% or $7,188. [5]   Defendant's citation to <u>United States v. Dominguez</u>, 296 F.3d 192 (3d Cir 2002)–which addressed extraordinary family circumstances– and <u>United States v. Stuart</u>, 22 F.3d 76 (3d Cir, 1994)–which addressed conversion of government bonds-- are unpersuasive.  The offense level and criminal history category are appropriate to the seriousness of the offenses in this case and this court should decline to depart downward from the properly calculated guidelines range.

III.   ANALYSIS.

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence is a sentence of incarceration within the advisory guideline range of 33 to 41 months.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007).  Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a).  Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public

---

[5]  The New Media payments were applied to accounts associated with the following Clark-related domain names, among others:  Blackolivefoods.com, Blackoliverestaurant.com, Blackolive.biz, Tekhen.com, and Clarkmcgill.com.

from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).

Consideration of the 3553(a) Factors.

The defendant engaged in serious offenses.  For over four years, Ivy League educated lawyer Hugh Clark stole funds intended for the public schoolchildren of Philadelphia. Clark stole large payments ranging from $6,000 to $25,000 disguised as "loans," to small payments like personal credit card expenses (including his Jenkin's law library membership).  He diverted funds -- intended for New Media schoolchildren – to no fewer than 15 third party vendors in support of his failed businesses.   And he resorted to bank fraud to acquire the building for his failed restaurant – leaving the bank holding the bag and pursuing foreclosure.[6] This course of criminal conduct is persistent and the harm is significant.   As set forth in the PSR, the victim impact statement from New Media states that it:

> has suffered, and continues to suffer, significant and financial and operational issues as a result of the theft and fraud perpetuated against it by Ina Walker and Hugh Clark. Specifically, over $500,000 of public school funds intended to be used for the education of the students of New media were misappropriated .... New Media's reputation within the Philadelphia educational community has been severely damaged, and its student enrollment and teacher recruitment efforts have suffered directly.

---

[6]  As outlined in the PSR, this is not the first time Clark directed Walker to act as a straw purchaser for real estate.  Walker owns the Washington Lane property –now in foreclosure– which defendant Clark has occupied since Walker purchased it in 1999.  See PSR n. 1.

New Media further states that additional losses (including civil lawsuits and claims) continue to be uncovered by the present board and administration.

Of course, the real victim of Clark's criminal scheme is the entire community. Clark abused the public trust – and public funds – entrusted to him as Chair of the Board of a Philadelphia public charter school. In a city where the public school district struggles under persistent financial woes, this is no small matter. Clark engaged in long-term serious criminal conduct that impacted students, teachers, staffers, and the public. Clark's crime falls squarely within the class of cases to which the applicable guidelines are addressed, and thus consideration of the nature of the offense, § 3553(a)(1), counsels in favor of the guideline sentence.

While Clark has not previously been convicted of a felony offense, the defendant's history supports the need for incarceration. Defendant is intelligent, well-educated, and capable of lucrative, honest pursuits. As a Harvard graduate with a law degree from the University of Pennsylvania, Clark has had the benefit of opportunities that are unavailable to the great majority of defendants before this Court, making his devotion to criminality all the more serious. Thus, the history and characteristics of the defendant (§ 3553 (a)(1)) support the sentence of incarceration recommended by the guidelines.

It is clear that the recommended term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2). Indeed, the recommended sentence of incarceration is necessary for both specific deterrence to Clark and deterrence to others who would commit a similar offense.

The need for deterrence is an important concern in this case. Charter schools are independent public schools which are supposed to have freedom to innovate and provide school

choice.  At root, however, they are publicly funded by local, state and federal tax dollars, and any sentence here should act as a deterrent to others who would breach the public's trust.

Another important concern is that of punishment.  Clark's criminal conduct was not a one-time or short-term event.  No amount of money was too large or too small to steal from New Media over the course of four years.   As the attached resignation letters and testimony will show, New Media teachers and staff worked hard to try to hold the school together while Clark and Walker bled the school of funds.  Teacher witnesses will testify that when they received paychecks, they immediately took their paychecks to the bank to be cashed, because they routinely learned that the last payroll checks to be cashed would not clear.   Some teachers struggled for textbooks to teach their classes; others struggled to ensure their retirement contributions to PSERS were properly funded.  Moreover, Clark directed a separate and additional bank fraud scheme, thwarting the WSFS lending system by faking documents and leaving the loan in default.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . ."  § 3553(a)(2)(D).   Also, the defendant has made no steps towards payment of restitution thus far, so it is better to address his crimes through incarceration.  § 3553(a)(7).

As discussed above, the defendant has not set forth any persuasive argument for leniency. Just as defendant's charitable contributions or lack of criminal history does not warrant a departure under the guidelines, it also does not support a downward variance. The defendant must be held responsible for his own actions. To the extent that Clark claims he has, in the past, performed charity and good works, such actions should be viewed in the context of what is typical and expected of individuals who have reached defendant's station in life: Clark is an Ivy League educated lawyer, capable of honest pursuits. Moreover, Clark is not deserving of leniency based upon an argument that he has "suffered enough" simply from having been convicted.

IV. CONCLUSION

Accordingly, as explained above, all the appropriate considerations of sentencing, such as the nature of the offense and the character of the offender, specific and general deterrence call for guidelines range of incarceration for this serious criminal conduct.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


_____
Joan E. Burnes
Assistant United States Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused to be served a true and correct copy of the Government's Sentencing Memorandum on this date, by electronic filing or electronic Mail as described below, to the following:

James Clark, Esquire
Schnader Harrison Segal & Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
(*via electronic filing*)

_____

JOAN E. BURNES
Assistant United States Attorney


DATE: July 10, 2012

# EXHIBIT 1

**EXHIBIT 1**

Monday, May 18, 2009

Dr. Ina Walker, CEO
Hugh Clark, ESQ / President of the Board of Directors
New Media Technology Charter School
8034 Thouron Avenue, Philadelphia PA 19150

RE: Letter of Resignation

Dr. Walker and Hugh Clark,

This letter is to formally document my resignation from my positions of Business Manager and Board of Directors Secretary from New Media Technology Charter School, effective Wednesday, May 13th 2009.

After being offered the option of renewing my contract for the 2009-2010 school year, I initially opted to renew my contract, however this decision was solely based on securing my job to ensure my family's financial stability. The initial decision to renew my contract was not based on a positive outlook for the future of the school because, although I believe that New Media's concept has a lot of potential for success, I do not feel in my heart that the school, nor its finances, is being managed properly.

When I accepted the promotion to the position of Business Manager in September 2008, I did so with the knowledge that it required much responsibility; especially pertaining to the components of cash accounting, accounts payable and payroll. It was extremely important for me to "redeem" the poor reputation that position of Business Manager held amongst the staff, due to the fact that the position has had a high turn-over rate and has had several business managers prior to me who have left "abruptly" (R    K    , A    M    , B    W    , D    E    , R    J    ).

When I took over the position I inherited an office that was in shambles: the filing system was not organized and had no rhyme nor reason, Quickbooks was grossly inadequate, cash was left lying around the office unsecured and unaccounted for, mail had not been opened in months, relationships with vendors was extremely strained due to outstanding balances that had been aging for more than 365 days, bank deposits had not been made, PSERS payments had not been made, employees paychecks were bouncing, and the main office had none of the supplies that it needed to operate, to include the basic necessities of paper, toner, postage and a properly functioning copy machine. At the time I strived to do the job to the best of my abilities, even though it seemed like the task was insurmountable, and this was my goal until the day I resigned.

Eight months after I assumed the position, the status of the business office has improved, but as a business manager, I could not thrive under the EXTREME circumstances, and I could not fully understand why the schools finances were in such poor shape without assuming that there had been financial wrong doing on both of your parts. Whenever I asked why PSERS had not been paid, or why New Media paid Lotus Academy $30,000

per month, I was never given a straight answer. After I questioned both of you as to why the business office and the school's finances are in the poor shape they are in, the blame was always placed on former employees who are no longer present to defend themselves, and had been labeled incompetent. Never once did either of you accept any responsibility as top executives who are in charge of running the school.

To this day, New Media's lack of finances dictates dire results. Currently two simultaneous lawsuits have been instituted against the school, on several occasions New Media has had to borrow money to make payroll, PSERS has not been paid for February, March and April 2009, athletic coaches have worked throughout the school year without pay (with no explanation of why they haven't been paid or estimation of when they will be paid), and once again key vendor accounts have been put on hold and as a result the facilities manager, O     F     , has no financial means to purchase supplies such as toilet paper and trash bags, and the main office, once again, is in jeopardy of going without supplies.  Lastly, for the second school year since I have been employed at New Media, the schools' lunch program has failed miserably, resulting in the janitorial and security staff having to prepare and serve the lunch, and the Human Resource Manager, C     K     , running the cash register in the cafeteria.

The list of reasons why I feel that my success with New Media is doomed could go on and on. But what I find most unacceptable is working directly under the administration of the President of the Board, Hugh Clark and CEO, Dr. Ina Walker, who portrayed themselves to be oblivious to the current disastrous financial outlook, and pretends to be unaware of just how the financial disaster came to be in the first place. What I find most egregious and appalling is a quote that I have read in the Inquirer; where Hugh Clark was quoted as solely blaming the former Business Manager, Dawn Eskridge, for PSERS not being paid, when clearly the blame was not hers. As I am no longer there to defend myself, I am submitting this letter for closure purposes as well as to clear my name. I refuse to be yet another person for you to throw under the bus when you are left to explain the financial mis-management and mis-appropriation.

My resignation is being tendered due to the culmination of events as aforementioned. I am also resigning due to my belief that I could not have done a better job under the circumstances and that the decisions that the both of you have made concerning the management of the school borders on reprehensible and immoral. My final day on the premises as an employee was Wednesday May 13th 2009. I resigned without giving notice, because I no longer wish for my name to be associated with your organization.

Submitted,
T     M

EXHIBIT 2

# EXHIBIT 2

S          K          G

January 2, 200

Dr. Ina Walker
Chief Executive Officer
New Media Technology Charter School

Dear M. Ina:

This letter will serve as my notice of resignation.   My last day will be January 16 or such earlier date as we agree.

I arrived at this decision after contemplating my tenure over the last six months.  One of my concerns has been the major changes in the organizational structure.  When we first started discussing the possibility of my employment in April, 2008, D       E       , J       M   , K       A       and H       J       were on staff, each working full time. D       D       , a consultant, was providing programming support for PowerSchool, student transcripts and report cards.  By the time I started in July, D       was on leave. In early August, after just a month of work, I expressed concern that the position as outlined could not be successfully accomplished by a single person and it was agreed that I needed an assistant, who would replace D     .  Job satisfaction occurs when the employee can complete the required work during the work week, plus or minus 10 percent.  My work has routinely required 60 to 70 hours per week.

Within less than 2 months, D       formally resigned and K       's replacement, C       S       , was no longer employed and a portion of their duties were assigned to me, including the massive task of working on creating student schedules.  In September, H       's furniture and equipment assessment and ordering responsibilities were shifted to me and he left your employ in late October.  When the assignment for the HR consultant, J       W       (who replaced J       ), ended in late November, I was advised that human resource duties and management would be added, at least temporarily, to my burgeoning list of responsibilities.  Both you and Hugh indicated that because of budget considerations, D      's consulting services would cease shortly.  The most recent organization chart shows M. O      reporting directly to me even though the duties of he and his staff include work at locations other than New Media.

Additionally, during our original and subsequent discussions, we agreed that my husband, C     , would not report to me at any time for legal and ethical reasons. However, after reviewing M. Hugh's late December emails, it appears that he expected that I should have provided oversight. M. Hugh and C      designed the program, agreed on the management software and I did not, nor was I requested to provide any reporting or management of any part of the food service program. During my tenure, I have not had any responsibility for the financial management or government payments or reimbursements to New Media or any of its sister organizations.

Finally, the current effort to prepare for renewal has required much more than simply gathering, reviewing and organizing the existing reports and files. Record keeping and procedures during the prior school years was seriously deficient in all areas. The attempt to repair, restore and create adequate documentation with a shrinking staff, while continuing the unending work with PIMS and other agency reports for 07-08 school year and maintain student records and reporting for the current school year and staff management have been impossible. Over the last six months, there has been almost no opportunities to properly evaluate and document policies and procedures or for the staff to celebrate successes.

I believe there is a serious oversimplification and underestimation of the time required of the research, tasks completion, oversight and management required to perform the job of director of operations. After the schedule created by N        J         was rejected, I worked more than a hundred of hours to creating at least five versions of a workable schedule for students. In November I worked over the weekend and several evenings to successfully manipulate the advisors grade spreadsheets to generate interim report, advisor summaries by grade and advisory and assessment charts. In December worked on the weekend and overnight to create a report card template and generate first trimester report cards for the parent/advisor conferences even though the information was supplied very late. Although D      and I were unable to bring PowerSchool into production because of a long series of special projects, first trimester high school student attendance was managed in a database through which reports were generated on demand for parents and social workers.

Due to the enormous work load created by poor recordkeeping in prior years and staffing shortage, including human resources and full time educational director-principal, I have determined that it is best for me to leave your hire.

The vision for New Media is laudable and I wish you and New Media the very best.

Cordially,


S      G